623 P.2d 839

**GENERAL ACRYLICS, an Arizona Corporation, Defendant-Appellant,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, a corporation, Defendant-Appellee.**

**No. 1 CA–CIV 4700.**

Court of Appeals of Arizona, Division 1, Department B.

Dec. 11, 1980.

Rehearing Denied Jan. 16, 1981.

Review Denied Feb. 3, 1981.

Kanne & Bickart by Allen B. Bickart and Monbleau, Vermeire & Turley by Albert R. Vermeire, Phoenix, for defendant-appellant.

Moore, Jennings, Kepner, Scheffing & Hart by Curtis A. Jennings and John C. Rea, Phoenix, for defendant-appellee.

## OPINION

JACOBSON, Judge.

This is a case of first impression in Arizona. It involves whether a surety or an unpaid subcontractor is entitled to funds remaining in the hands of the owner upon completion of a construction project performed under Arizona's Little Miller Act.

The facts are not in dispute and this matter was disposed of in the trial court by way of summary judgment. On June 1, 1976, the Tuba City Unified School District No. 15 (Tuba City) entered into a contract with J. D. Slavens, dba Slavens Construction Company (Slavens), for the construction of locker rooms and an athletic field at the Tuba City High School. This contract was controlled by Arizona's "Little Miller Act," A.R.S. §§ 34-221, et seq., and required Slavens to furnish a performance bond to insure Slavens' full performance of the contract, and a payment bond to insure that all subcontractors, materialmen and laborers were paid. Accordingly, appellee, United States Fidelity & Guaranty Company (USF&G), as surety, executed and delivered performance and payment bonds in the amount of $443,000.00, the total amount of the construction contract, naming Tuba City as obligee.

In connection with this contract, Slavens entered into subcontracts with All American School Supply (All American) and with appellant, General Acrylics (Acrylics), to perform certain work under its general contract.

Although Slavens subsequently completed the construction contract and received the sum of $337,359.12 from Tuba City, it failed to pay several subcontractors and suppliers, including All American and Acrylics. At the time of completion of the contract, Tuba City still held the sum of $106,228.94 owed Slavens.

A dispute then arose among Slavens, All American and Acrylics as to which one was entitled to all or part of the unpaid contract proceeds held by Tuba City. As a result of this dispute, Tuba City filed a complaint in interpleader in Coconino County Superior Court, interpleading the unpaid balance due on the contract.

In a separate action, All American filed a complaint against Acrylics, Slavens and USF&G, asserting a claim for the balance due under its subcontract to Slavens.

Acrylics filed an answer in that action, asserting that Slavens owed it $78,000.00 plus costs and interest, but did not seek affirmative relief against USF&G on its claim.

By stipulation in the interpleader action, Tuba City was discharged from all further liability to the parties upon depositing the sum of $105,813.62 with the clerk of the court. The trial court subsequently determined that Slavens had no interest in this sum.

On this state of the record, All American moved for summary judgment against Slavens in its action on its claim of $194,000.00 plus interest, costs and attorneys fees. This summary judgment was granted.[1]

All American subsequently moved for summary judgment against USF&G as surety on Slavens' payment bond. This judgment likewise was granted, and USF&G paid All American the total amount of its judgment in the sum of $243,123.41.

On July 21, 1978, All American filed a satisfaction of judgment and an assignment of its judgment against Slavens to USF&G. This assignment transferred to USF&G all of All American's right, title and interest in its judgment against Slavens. At this time, over $200,000.00 remained on USF&G's bond for payment of legitimate claims under the Slavens/Tuba City contract.

Subsequently, Acrylics filed a cross-claim against Slavens in the All American action. At the time of oral argument, both parties agreed that this court could consider that Acrylics was successful in that cross-claim and obtained a judgment against Slavens.

Although Acrylics alleged that it had completed its work under its subcontract with Slavens on July 15, 1977, Acrylics made no claim against the USF&G's payment bond until March 1, 1979, when it filed an action against USF&G in Maricopa County Superior Court. Again, at the time of oral argument, both parties agreed that this court could consider in determining this

---

1. The granting of this summary judgment was affirmed in *All American School Supply Co. v. Slavens*, 125 Ariz. 231, 609 P.2d 46 (1980).

matter that Acrylics was unsuccessful in its action against USF&G, its claim on the payment bond being barred for failure to make a claim within one year of the completion of the subcontract. *See* A.R.S. § 34–223(C).

In the interpleader action, USF&G, as the assignee and subrogee of All American, moved for summary judgment, claiming it was entitled to all the sums interpleaded by Tuba City. Acrylics also moved for summary judgment in that action, claiming that it, as an unpaid subcontractor, was entitled, as against USF&G as a surety, to have its claim first paid out of this fund. The trial court granted judgment in favor of USF&G and Acrylics has appealed.

It is Acrylics' position on appeal that, based upon equitable principles, a surety under a payment bond executed solely for the protection of claimants supplying labor and materials to the contractor is not entitled to be subrogated to earned, but unpaid, contract proceeds until all laborers and materialmen have been paid. From this premise, it argues that since it remains an unpaid subcontractor, it has first priority under an equitable lien theory on the interpleaded proceeds. On the other hand, USF&G contends that under Arizona's Little Miller Act, where sufficient funds remain under a payment bond to pay all claims of subcontractors, laborers and materialmen, the sole remedy of this class of creditors is an action on that bond. The argument continues that the failure to make a timely claim on the bond precludes Acrylics from asserting a claim on the earned but unpaid proceeds under the contract as against it, as an assignee and subrogee of a timely claimant. Both parties agree that they have been unable to find any authority directly in point.

The problem is not without difficulty and for this reason background legal principles are worth identifying. We start with the proposition that public buildings and public works are not subject to the same mechanic lien laws that govern private construction. *Webb v. Crane Co.*, 52 Ariz. 299, 80 P.2d 698 (1938). Therefore, persons supplying labor or materials on such public works are unable to look to the sale of the fruits of their labor or materials to obtain remuneration in the event they are not paid. For this reason, Congress and the various state legislatures have enacted legislation requiring that in lieu of such lien rights, contractors dealing with the federal or state government must provide bonds as security for both the performance of the contract and the payment of laborers and materialmen on the project.[2]

The federal act is referred to as the Miller Act (40 U.S.C.A. 270a). The Arizona Legislature has enacted its own "Little Miller Act" in A.R.S. § 34–221 et seq. A.R.S. § 34–222 of this Act provides in part:

A. ... [B]efore any contract is executed with any person for the construction, alteration, or repair of any public building, a public work or improvement ... he shall furnish to the agent entering into such contract, the following bonds which shall become binding upon the award of the contract to such person, who, for purposes of this article means "contractor":

\* \* \* \* \* \*

A payment bond in an amount equal to the full contract amount solely for the protection of claimants supplying labor or materials to the contractor or his subcontractor in the prosecution of the work provided for in such contract.

However, the right to be paid from the payment bond is not without limitation. A.R.S. § 34–223(C), provides that no suit on the bond shall be commenced "after the expiration of one year from the date on which the last of the labor was performed or materials were supplied ...."

From this federal and state legislation various legal rights have been established *vis a vis* the government, the contractor,

---

**2.** We note the USF&G did not incur any obligation under its performance bond and all rights claimed by it are under the payment bond.

the subcontractors, laborers and material-men, the bonding surety and general credi-tors of the defaulting contractor or subcon-tractor. These rights, as among the various classes, are important because normally, as is the case here, some funds remain in the hands of the governmental body either as the result of retainage (*see* A.R.S. § 34–221(A)(3)), or as the result of monies being earned, but unpaid.[3]

As to these types of funds, one of the rights of the surety is that of equitable subrogation.[4] This right arises out of the equitable doctrine that when one, pursuant to a legal obligation and not as a volunteer, fulfills the duty of another he is entitled to assert the rights of that other against third parties. *National Shawmut Bank of Boston v. New Amsterdam Cas. Co.*, 411 F.2d 843 (5th Cir. 1969). As this case points out, the surety may acquire various rights of subro-gation:

> When, on default of the contractor ... [the surety] pays all the bills on the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and materialmen who have been paid by the surety—who may have had liens; and, not least, in the shoes of the government, for whom the job was completed.

411 F.2d at 845.

The "lien" of the laborer and material-man referred to in the quotation needs fur-ther explanation. As previously indicated, this class of persons does not have "lien" rights comparable to those in the private sector. However, numerous cases have held that the government is under an equitable obligation to apply funds in its hands due for public construction to those classes of individuals who performed the construction. *See Pearlman v. Reliance Ins. Co.*, 371 U.S.

132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). As is stated in *In re Dutcher Construction Corp.*, 378 F.2d 866, 870 (2nd Cir. 1967):

> The reason for this equitable obligation rests on the principle that it would be unfair for the government to permit money to go to general creditors, whose services did not contribute to the per-formance of the contract, when laborers and materialmen responsible for perform-ing the contract remain unpaid. The re-sult is to put the contractor, laborers and materialmen in the same position *vis a vis* the money due on the contract as they would have been had they contracted with a private party whose property was subject to mechanic's liens.

Put another way, an owner of private property, in order to discharge any liens on his property because of the failure of his contractor to pay laborers and materialmen, has a right to use funds due under the contract to discharge these obligations. Thus, while the government is under no legal obligation to discharge these debts, it is under an equitable obligation to do so. *See National Surety Corp. v. United States*, 133 F.Supp. 381 (Ct.Cl.1955).

Thus, the case law is fairly consistent in holding that as against general creditors of the defaulting contractor, the surety has an equitable right of subrogation, and laborers and materialmen have an equitable lien as to funds in the hands of the government which are earned, but unpaid.

The position of the parties in this case puts in direct conflict these equitable rights, not as against general creditors, but as against each other. Acrylics strongly ar-gues that since both parties' rights arise from equitable principles, the balancing of the equities favor it, as against USF&G which is paid to take its risk, for the reason that the law should favor payment of un-

---

3. From a legal analysis, we find it immaterial that Tuba City interpleaded the earned but un-paid proceeds rather than simply retaining those funds subject to this litigation. Nor do we distinguish in this opinion between funds which are statutorily authorized to be withheld by the government body and those that are simply not paid by the government body.

4. USF&G does not argue that any contractual rights of subrogation it may have acquired un-der its bond are superior to or different from the rights of subrogation it acquires by opera-tion of equitable principles.

paid laborers and materialmen, and the surety's rights of subrogation arise only when the whole debt is satisfied.

The rationale of Acrylics' position finds facial support in the case of *American Surety Company v. Westinghouse Electric Manufacturing Co.*, 296 U.S. 133, 56 S.Ct. 9, 80 L.Ed. 105 (1935). In *Westinghouse*, a surety posted a payment bond under a government contract which paid some, but not all of the claims of laborers and materialmen. The surety paid the full amount of its bond and then sought in the contractor's bankruptcy to share with unpaid laborers and materialmen in the funds which the government had withheld under the contract. In rejecting the surety's position, the court stated:

> A surety who has undertaken to pay the creditors of the principal, though not beyond a stated limit, may not share in the assets of the principal by reason of such payment until the debts partially protected have been satisfied in full.

296 U.S. at 137, 56 S.Ct. at 11, 80 L.Ed. at 109–110.

The court then reasoned that where the bond was for the protection of laborers and materialmen, the surety who partially paid the debts of this class could not share with others of the same class in the retained funds. *Westinghouse* is sound authority for the proposition that where a surety is liable for only a portion, but not all, of the debts of a particular class, it is not entitled to full subrogation rights against creditors in the same class. However, it does not answer the question of the subrogation rights of the surety who stands ready and able to pay all claims of a particular class, but members of that class do not take advantage of that security.

Another case cited by Acrylics, which again is facially similar to the fact situation before us, is *American Surety Co. v. Sampsell*, 327 U.S. 269, 66 S.Ct. 571, 90 L.Ed. 663 (1946). In *Sampsell*, apparently in a private construction setting, a bond was posted in accordance with the California statutes to pay laborers and materialmen. The California statute set a time limitation on presenting claims on this bond. Upon bankruptcy of the contractor, the surety paid all claims timely presented to it under the statute. The controversy then arose in bankruptcy court as to rights in the contractor's general assets between the surety and claims of laborers and materialmen who had not made timely claim on the bond. The court applying federal bankruptcy law held under the *Westinghouse* rationale that a surety cannot share equally with creditors of the class which the surety sought to protect. The court found no difference between the unprotected claimants in *Westinghouse* and the untimely claimants before the court, concluding both had no rights under the bond.

We find *Sampsell* unpersuasive in two respects: (1) the court was applying general federal bankruptcy principles, and (2) the court failed to fully analyze the state statutes dealing with the subject of timely filing against the bond.

We prefer to analyze the legal posture of the parties as to what their positions would be, inasmuch as possible, if this were a private construction project. In such an analysis, the payment bond becomes the "property" against which liens could be filed to secure payment for labor and materials. In our opinion this is the obvious legislative intent under Arizona's Little Miller Act.

In a private construction setting, it is clear that untimely lien claimants, although admittedly contributing to the value of the completed structure, have no right to share with timely lien claimants in the proceeds of the sale of the liened property. *Intermountain Building & Loan Association v. Albert Steinfeld & Co.*, 40 Ariz. 545, 14 P.2d 742 (1932); *Lewis v. Midway Lumber, Inc.*, 114 Ariz. 426, 561 P.2d 750 (App.1977).

While the doctrine of "equitable lien" rights of laborers and materialmen has some validity in analyzing rights as between laborers and materialmen and general creditors of the contractor, it has little value in analyzing rights between parties who have actual connection with the construction, at least where there exists suffi-

cient "property" in the form of payment bonds to pay all laborers and materialmen.

Thus, the cases that have dealt with the rights of parties involved in the construction have not applied the equitable lien theory. In *United Pacific Insurance Co. v. United States*, 319 F.2d 893 (Ct.Cl.1963), the controversy was over funds retained by the government under a Miller Act contract as between a surety who had paid all laborers and materialmen who had presented claims to it and the trustee in bankruptcy of the contractor who claimed there existed laborers and materialmen who had not been paid. The bond was sufficient to pay all claims. In holding that the surety by reason of its rights of subrogation was entitled to the retained funds, the court noted that unpaid laborers and materialmen had "no right to assert a claim against the money in the hands of the government" and that their sole remedy was on the bond. 319 F.2d at 896. The court went on to state:

If Mr. Briggs was in fact a materialman, and, so prevails in District Court, he will, by force of judgment, be paid by the surety. As such, he cannot assert a claim against the funds in the hands of the United States, and, hence, the trustee's allegation that Briggs was a materialman who had not been paid by the surety does not defeat the right of the surety to subrogation on account of the amounts it had already paid to materialmen and laborers, to the extent of the funds held by the United States.

319 F.2d at 896.

A similar result was reached in *United States v. Commonwealth of Pa., Department of Highways*, 349 F.Supp. 1370 (E.D. Pa.1972) which held:

. . . [I]t is clear that the time for filing suits against National [the surety], or any of the other sureties on these contracts, has long since expired. The limitation in respect to the time in which a suit may be filed is a condition precedent to the action itself, because a limitation on such a liability becomes a part of the right conferred. Since any claims would now be barred by the one year limitation, there can be no unpaid claims as a matter of law. Moreover, even if there were unpaid claims, the materialmen's sole right for reimbursement would be an action on the bond against the Surety and the fact that there was a failure by the surety to pay a claim would not, in and of itself, defeat the surety's right to subrogation . . . .

349 F.Supp. at 1378

In discussing the equitable lien rights of laborers and materialmen in funds earned, but unpaid, the court noted in *United States v. MacDonald Construction Co.*, 295 F.Supp. 1363, 1366 (E.D.Mo.1968):

This equitable lien, however, only extends to funds in the hands of the United States which it has determined are due and payable to the prime contractor under terms of the prime contract. (Citation omitted.) The materialman or the laborer may not pursue such remedy unless the surety of the bond provided by the Miller Act is insolvent and unable to pay the amounts they are entitled to.

Also see *Rondout Marine, Inc. v. Brydon Construction Corp.*, 67 Misc.2d 1, 322 N.Y. S.2d 890 (1971).

■ If, then, the bond stands for the "property" in public contracts, that bond being sufficient to pay all claims, and is the sole source from which laborers and materialmen are to be paid, it necessarily follows that laborers and materialmen who do not timely avail themselves of this remedy fall into the category of general creditors of the contractor. This view is supported by the case of *Weber Implement & Automobile Co. v. Dubach*, 132 Kan. 309, 295 P. 979 (1931), which held that a surety who had paid untimely claims of laborers and materialmen and other laborers and materialmen who had not made timely claim on the bond were all general creditors of the contractor and only entitled to a *pro rata* distribution of earned but unpaid proceeds from the construction project.

■ Applying this legal analysis to the facts of this case, Acrylics failed to file a timely claim against the USF&G bond

which was sufficient to pay its claim in full. We hold that by this failure, Acrylics lost any equitable lien it might have in the earned, but unpaid proceeds interpleaded by Tuba City, and was thus reduced to the status of the general creditor of Slavens. As between Acrylics as a general creditor and USF&G as a surety subrogee of a materialman who made timely claim against the payment bond, USF&G is entitled to the funds held by the court. *Pearlman v. Reliance Ins. Co., supra.*

Judgment affirmed.

HAIRE, P. J., and EUBANK, J., concur.